**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| **JESUS ELIOSA GALICIA,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **Civil Action No.** |
| **v.** | ) | **26-11468-FDS** |
| | ) | |
| **TODD LYONS, et al.,** | ) | |
| | ) | |
| **Respondents.** | ) | |
| | ) | |

**MEMORANDUM AND ORDER ON PETITION FOR WRIT OF HABEAS CORPUS**

**SAYLOR, J.**

This is a habeas petition that concerns the government's statutory and constitutional authority to hold a noncitizen without a bond hearing pending removal proceedings.

Petitioner Jesus Eliosa Garcia is a Mexican national who entered the United States in 2016. He was paroled into the United States under 8 U.S.C. § 1182(d)(5)(A), commonly referred to as the humanitarian parole statute. That parole expired one year later, in 2017. After an arrest in Connecticut, he was taken into custody in 2026.

The statute explicitly provides that "parole . . . shall not be regarded as an admission of the alien" and that, when parole is terminated, the noncitizen's "case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A). The government contends that because the statute explicitly defines petitioner to be an "applicant for admission," he is subject to mandatory detention under 8 U.S.C. § 1225(b). That contention is clearly correct as a matter of statutory construction, and therefore, according to the statute, mandatory detention without an opportunity for a bond hearing is required.

That leaves the question whether the statute, as applied here, violates the Due Process Clause of the Fifth Amendment.  Because the Court ultimately concludes that it does not, the Court will deny the petition.

## I.    Background

Jesus Eliosa Garcia, a Mexican national, entered the United States at the Calexico, California, port of entry on July 1, 2016.  (Pet. ¶ 23).  At that time, he was paroled into the United States under 8 U.S.C. § 1182(d)(5)(A).  (*Id.*).  His parole was valid for a term of one year—that is, until July 1, 2017.  (*Id.*).

At some point after petitioner entered the United States, he married a U.S. citizen, and he now has a U.S. citizen daughter.  (*Id.* ¶ 30).  His wife has submitted an I-130 Petition for Alien Relative on his behalf that seeks to permit him to obtain lawful status.  (*Id.* ¶ 31).  That petition is still pending.

On August 28, 2025, petitioner was arrested by officers of the Bridgeport, Connecticut, police department and charged with assault in the third degree, risk of injury to a child, and breach of peace in the second degree.  (Dkt. No. 6-1 at 1-4).  The charges stemmed from an incident where petitioner allegedly choked his wife and threw a shoe at her.  (*Id.* at 1-3).

On February 19, 2026, petitioner was taken into custody by immigration enforcement agents after attending a hearing in Bridgeport Superior Court.  (Pet. ¶¶ 3, 36; Dkt. No. 6-1 at 2; Dkt. No. 6-2 at 2).

Respondents are Todd Lyons; Markwayne Mullin, U.S. Secretary of Homeland Security; the Department of Homeland Security; Todd Blanche, Acting Attorney General of the United

States;[1] the Executive Office for Immigration Review; Antone Moniz, Superintendent, Plymouth County Correctional Facility; and Joseph McDonald, Plymouth County Sheriff.  (Pet. ¶¶ 15-19).

On March 27, 2026, the Court ordered that petitioner not be moved outside this District without prior notice until further order of the Court.  (Dkt. No. 4 at 2-3).

## II.     Analysis

Petitioner's principal constitutional argument is that his continued detention without an opportunity for a bond hearing violates his Fifth Amendment due process rights.

It is well-established that the Fifth Amendment applies to all "persons" within the United States, including noncitizens.  *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).  The amendment's reach is limited in the immigration context, however, by the so-called entry-fiction doctrine.  Under that doctrine, noncitizens are sometimes permitted to physically enter the United States—such as through humanitarian parole—but are "nonetheless treated, for legal purposes, as if stopped at the border."  *Martinez v. Hyde*, 792 F. Supp. 3d 211, 216 (D. Mass. 2025) (quoting *Department of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020)) (citation modified).

As a general matter, due process is satisfied if noncitizens who are stopped at the border receive the procedural protections provided by statute.  *See United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950) ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.").  The Supreme Court, however, has never directly addressed the issue of whether broader protections, including the right to a bond

---

[1] Todd Blanche is automatically substituted for Pamela Bondi pursuant to Fed. R. Civ. P. 25(d).  The Clerk is directed to update the caption accordingly.

hearing, are required to satisfy due process when applied to the detention of a parolee who has spent substantial time in the United States since his parole.

One of the Court's first cases addressing the legal effect of immigration parole was *Kaplan v. Tod*, 267 U.S. 228 (1925).  That case involved a habeas petition brought by a petitioner who was classified as "feeble minded," rendering her inadmissible, and who was detained at Ellis Island.  *Id.* at 229.  World War I began shortly after her detention, rendering deportation unrealistic; as a result, she was paroled to an immigrant-aid society and eventually went to live with her father.  *Id.*  While she resided with her father on parole, he was naturalized as a U.S. citizen.  *Id.*  Under a then-existing statute, minor children of those naturalized also became citizens only if they were "dwelling in the United States."  *Id.* at 230.  Whether the petitioner was a citizen therefore turned on whether she was "dwelling in the United States" while she was living with her father on parole.

The Court held that she was not.  *Id.*  "[W]hile she was at Ellis Island," the Court reasoned, "she was to be regarded as stopped at the boundary line and kept there unless and until her right to enter should be declared.  When her prison bounds were enlarged by committing her to the custody of the [aid society], the nature of her stay within the territory was not changed."  *Id.*  In a formulation cited in many later cases, the Court held that "[s]he was still in theory of law at the boundary line and had gained no foothold in the United States."  *Id.*  The very next sentence, however, shows that the case was decided on statutory, rather than constitutional, grounds:  "She never has been dwelling in the United States *within the meaning of the Act*."  *Id.* (emphasis added).

The Supreme Court considered a related issue in *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953).  That case involved a noncitizen who had resided in the United

4

States from 1923 to 1948, left the country to visit his mother in eastern Europe, and then attempted to reenter the country in 1950. *Id.* at 208. He was ordered excluded on national-security grounds and was detained at Ellis Island; no other country would accept him, and his detention therefore projected to be indefinite. *Id.* He sought a writ of habeas corpus on two grounds: first, that the Attorney General should be required to disclose the information on which his exclusion was based; and second, that he should be released on bond until his deportation could be effected. *Id.*

The Court denied him relief. It began by noting that, although "aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law," "an alien on the threshold of initial entry stands on a different footing: 'Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.'" *Id.* at 212 (quoting *Knauff*, 338 U.S. at 544). And although the petitioner was physically located within the United States on Ellis Island, the Court held that "harborage at Ellis Island is not an entry into the United States," and that the petitioner therefore was not entitled to additional constitutional protections. *Id.* at 213. As for petitioner's continued detention, the Court recognized that "to admit an alien barred from entry on security grounds nullifies the very purpose of the exclusion proceeding" and that his continued detention did not "deprive[] him of any . . . constitutional right." *See id.* at 215-16. In other words, the Court did not limit application of the entry-fiction doctrine to the exclusion proceeding alone, but also applied it to conclude that the petitioner had no constitutional right to release from detention during exclusion proceedings.

The Supreme Court again addressed a similar issue in *Leng May Ma v. Barber*, 357 U.S. 185 (1958). The petitioner in that case was a Chinese citizen who arrived in the United States in

1951, claiming to be a U.S. citizen based on her father's citizenship. *Id.* at 186. She was initially held in immigration detention but was later paroled into the country under INA § 212(d)(5), an earlier version of the same provision at issue here. *Id.* at 188. Another provision of the INA, § 243(h), permitted the Attorney General "to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to physical persecution." *Id.* at 185. The issue, therefore, was whether the petitioner, having been paroled, was "within the United States" such that her deportation could be withheld under that provision.

The Court held that she was not. *Id.* at 187. Beginning its analysis, the Court noted that "our immigration laws have long made a distinction between those aliens who have come to our shores seeking admission, such as petitioner, and those who are within the United States after an entry, irrespective of its legality. In the latter instance the Court has recognized additional rights and privileges not extended to those in the former category who are merely 'on the threshold of initial entry.'" *Id.* (quoting *Mezei*, 345 U.S. at 212). "For over a half century," the Court continued, "this Court has held that the detention of an alien in custody pending determination of his admissibility does not legally constitute an entry though the alien is physically within the United States. It seems quite clear that an alien so confined would not be 'within the United States' for purposes of § 243(h). . . . Our question is whether the granting of temporary parole somehow effects a change in the alien's legal status." *Id.* at 188. Examining the statutory language and the context against which it was enacted, the Court found that "[t]he parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted," and that "[i]t was never intended to affect an alien's status." *Id.* at 190. As in *Kaplan*, however, this was a purely statutory holding; the Court

6

did not address whether the petitioner's parole affected the constitutional protections to which she was entitled under the Due Process Clause.

Later Supreme Court cases have been somewhat inconsistent as to how they characterize the entry-fiction doctrine—in particular, whether it applies only to the decision whether to admit or exclude a noncitizen.  For example, in *Landon v. Plasencia*, the Court wrote that "[t]his Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights *regarding his application*, for the power to admit or exclude aliens is a sovereign prerogative."  459 U.S. 21, 32 (1982) (emphasis added).  That same case characterized the holding of *Mezei* in a similar vein:  "In [*Mezei*], this Court rejected the argument of an alien who had left the country for some twenty months that he was entitled to due process in assessing his *right to admission on his return*."  *Id.* at 33-34 (emphasis added).

Language in the Supreme Court's most recent decision applying the entry-fiction doctrine also supports that limited reading.  In *Department of Homeland Security v. Thuraissigiam*, the Court held that a noncitizen detained by Border Patrol 25 yards from the border, although physically present within the United States, "has only those *rights regarding admission* that Congress has provided by statute."  140 S. Ct. 1959, 1983 (2020) (emphasis added).

In those cases, the Court's language has arguably limited the reach of the entry-fiction doctrine to a noncitizen's rights concerning admission into the United States.  Those cases could therefore be read to indicate that the doctrine does not apply to other types of proceedings, such as the determination of whether a noncitizen previously paroled into the country should be subject to mandatory detention.  Several district courts have adopted that reading.  *See Al-Thuraya v. Warden*, 809 F. Supp. 3d 135, 142-44 (S.D.N.Y. 2025); *Lopez-Arevelo v. Ripa*, 801 F.

7

Supp. 3d 668, 682-84 (W.D. Tex. 2025); *Alvarez-Rico v. Noem*, 2026 WL 522322, at *3-4 (S.D. Tex. Feb. 25, 2026).

Other language in *Thuraissigiam*, however, casts doubt on that interpretation. Justice Alito's opinion for the Court states, albeit in dicta, that "aliens who arrive at ports of entry—*even those paroled elsewhere in the country for years pending removal*—are 'treated' for due process purposes 'as if stopped at the border.'" *Thuraissigiam*, 140 S. Ct. at 1982 (quoting *Mezei*, 345 U.S. at 215) (emphasis added). That statement contained no qualifying language limiting the scope of the entry-fiction doctrine.[2]

As a final note, the issue of the constitutionality of mandatory detention was raised in *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018), but the Supreme Court did not decide the question. In that case, the Ninth Circuit had applied the constitutional-avoidance canon to interpret various provisions requiring detention—§ 1226(a), § 1226(c), and § 1225(b)—as including an implicit six-month time limit on detention without a bond hearing. *Id.* at 839. The Supreme Court reversed, noting that the canon applies only where a statute is ambiguous, and the relevant provisions unambiguously mandated detention. *See id.* at 842-48. The Court "[did] not reach [the] arguments" that the various statutory provisions were in fact unconstitutional on that reading. *Id.* at 851.[3]

In any event, the relevant Supreme Court case law leaves some uncertainty concerning the scope of the entry-fiction doctrine. There is a credible argument that the doctrine applies

---

[2] The Court cited *Mezei*, *Leng May Ma*, and *Kaplan* in support of that proposition. But, as noted, *Leng May Ma* and *Kaplan* rested on statutory grounds, and in *Landon* the Court appeared to limit the scope of *Mezei* to admission proceedings.

[3] The Supreme Court recently granted review in a case raising the question of "[w]hether there is a point at which [a noncitizen's] detention under § 1226(c) . . . becomes 'unreasonably prolonged,' such that due process requires a bond hearing." *See Genalo v. Black*, 2026 WL 1718025 (U.S. June 15, 2026).

only in two situations:  (1) a proceeding to determine whether a noncitizen is to be formally admitted into the United States and (2) a proceeding to determine whether a noncitizen stopped at the border (or at its functional equivalent, as in *Thuraissigiam*) should be paroled into the country while awaiting a decision on his admissibility.  Under that approach, the doctrine would not apply to a parolee who is arrested after his parole has expired but before he is ordered removed from the country—and, accordingly, the mandatory detention of such an individual without a bond hearing would violate due process for the reasons the First Circuit addressed in *Hernandez-Lara v. Lyons*, 10 F.4th 19 (1st Cir. 2021).

Some sessions of this court have found mandatory detention for individuals in those or similar circumstances to be unconstitutional.  *See Rincon v. Hyde*, 810 F. Supp. 3d 101, 110-112 (D. Mass. 2025); *Tenemasa-Lema v. Hyde*, 810 F. Supp. 3d 244, 252-53 (D. Mass. 2025). Others, however, have reached an opposite conclusion.  *See Benito Vasquez v. Moniz*, 788 F. Supp. 3d 177, 180 (D. Mass. 2025); *Banegas v. McDonald*, 2025 WL 3251395, at *3 (D. Mass. Nov. 21, 2025); *Guaranda Macias v. Moniz*, Case No. 26-cv-10677, Dkt. No. 8 (D. Mass. Mar. 5, 2026).

Under the circumstances, this Court concludes that petitioner's detention without an opportunity for a bond hearing does not violate due process.  Judging the constitutionality of an Act of Congress "is the gravest and most delicate duty that" a federal court "is called on to perform."  *Shelby County v. Holder*, 570 U.S. 529, 556 (2013) (quoting *Blodgett v. Holden*, 275 U.S. 142, 148 (1927) (Holmes, J., concurring)).  Congress has evinced a clear intent that noncitizens paroled into the United States "shall . . . be dealt with in the same manner as  . . . any other applicant for admission" after their parole is terminated, 8 U.S.C. § 1182(d)(5)(A), and that applicants for admission "shall be detained" pending removal proceedings in most

circumstances. *Id.* § 1225(b)(2)(A).  It is no minor matter for a district court to declare any portion of that statutory scheme unconstitutional.  And while a district court has a duty to declare an act of Congress unconstitutional under appropriate circumstances, it should be particularly cautious where there is no clear indication or suggestion, in Supreme Court jurisprudence or otherwise, that such a finding is correct.

No such signal is present here.  At most, the Supreme Court has been silent on the topic of whether mandatory detention of immigration parolees is unconstitutional, and thus may be said to have left that possibility open.  And while it is true that *Kaplan* and *Leng May Ma* were resolved on statutory, not constitutional grounds, a finding of unconstitutionality would seem to run counter both to the spirit of those cases and the Supreme Court's treatment of them in *Thuraissigiam*.

Such a due process claim also raises difficult line-drawing issues.  Although this petitioner was initially granted parole for a term of one year and has now resided in the United States for nearly a decade, humanitarian parole is often granted for shorter periods of time than that.  *See, e.g.*, *Alcantara Guerrero v. Wesling*, 2026 WL 931503, at *2 (D. Mass. Apr. 6, 2026) (noncitizen paroled for two months).  Based on petitioner's argument, it is unclear at what point the entry-fiction doctrine would cease to apply and greater due-process protections would attach.  And an unduly restrictive approach to the doctrine might have unintended adverse consequences, as the government might conclude that humanitarian parole is not an appropriate action if it cannot "deal[] with" former parolees "in the same manner as that of any other applicant for admission to the United States" once their parole is terminated.  8 U.S.C. § 1182(d)(5)(A).

10

For those reasons, the Court concludes that petitioner's continued detention without an opportunity for a bond hearing does not violate the Fifth Amendment.[4]

### III.   Conclusion and Order

Accordingly, and for the foregoing reasons, the petition for a writ of habeas corpus under 28 U.S.C. § 2241 is DENIED.

**So Ordered.**

/s/  F. Dennis Saylor IV

F. Dennis Saylor IV

Dated:  June 26, 2026                          United States District Judge

---

[4] Petitioner also argues that the government's action in arresting him at a state courthouse violated his First and Sixth Amendment rights.  (Pet. ¶¶ 62-75).  These arguments are irrelevant to this proceeding because neither claim relates to the question of whether petitioner is currently "in custody in violation of the Constitution or laws . . . of the United States."  28 U.S.C. § 2241(c)(3).  Accordingly, they are not grounds on which habeas relief could be granted.